RANDOLPH GAW (S.B. #223718)
  rgaw@gawpoe.com
MARK POE (S.B. #223714)
  mpoe@gawpoe.com
SAMUEL SONG (S.B. #245007)
  ssong@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiff and Counterclaim Defendant
Products and Ventures International and
Counterclaim Defendant Carlos Fairbanks

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PRODUCTS AND VENTURES INTERNATIONAL,<br><br>Plaintiff,<br><br>v.<br><br>AXUS STATIONERY (SHANGHAI) LTD., et al.,<br><br>Defendants. | Case No. 4:16-CV-00669-YGR<br><br>**[PROPOSED] ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' ADMINISTRATIVE MOTION TO TEMPORARILY SEAL CERTAIN PORTIONS OF THE RECENT FILINGS ON BEHALF OF PLAINTIFF/COUNTERCLAIM DEFENDANTS**<br><br>`*as modified by the Court*`<br><br>Judge: Hon. Yvonne Gonzalez Rogers |
| ROBERTA TRADING CORPORATION,<br><br>Counterclaimant,<br><br>v.<br><br>PRODUCTS AND VENTURES INTERNATIONAL and CARLOS FAIRBANKS,<br><br>Counterclaim Defendants. | |

Having considered Defendants' Administrative Motion to Temporarily Seal Certain Portions of the Recent Filings on behalf of Plaintiff/Counterdefendants (ECF No. 253), and all papers filed by the parties in support and opposition thereof, **IT IS HEREBY ORDERED THAT** Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

The Court finds that settlement discussions that occurred on or before January 25, 2018 are made "in connection with [the] settlement conference." ADR Local Rule 7-4(a). Accordingly, these discussions are subject to protection. The Court therefore finds the following portion of Plaintiff's Motion to Enter Judgment are **SEALED** and **STRICKEN**:

- Page 5, Lines 7-8, starting with "because" and ending with "conference."

Attached as Exhibit A to this Order is a version of PVI and Carlos Fairbanks's Motion to Enter Judgment Pursuant to Settlement (ECF No. 243) (the "Motion") with the protected language redacted. The clerk of the court will ensure that this is the only publicly accessible version of the Motion.

The Court finds that discussions which occurred between the parties after the January 25, 2018 settlement conference relate to performance of the settlement agreement and thus were not made "in connection with [the] settlement conference." ADR Local Rule 7-4(a). Accordingly, these discussions are not subject to protection.

The parties shall file in the public record the documents or portions thereof as to which the requests to seal have been denied, consistent with this Order and the Court's order dated July 25, 2018 (Dkt. No. 261), within **seven (7) days** from the date of this Order. *See* Civil Local Rule 79-5(f)(3).

**IT IS SO ORDERED.**

Dated: August 7, 2018

YVONNE GONZALEZ ROGERS
United States District Judge

[PROP] ORDER GRANTING IN PART AND DENYING IN PART DEFS.' ADMIN. MOTION TO SEAL

**APPROVED AS TO FORM:**

Dated: August 1, 2018      GAW | POE LLP

By:    /s/ Randolph Gaw
        Randolph Gaw
        Attorneys for Plaintiff and
        Counterclaim Defendant Products and
        Ventures International and
        Counterclaim Defendant Carlos
        Fairbanks

Dated: August 1, 2018      WINSTON & STRAWN LLP

By:    /s/ Krista M. Enns
        Krista M. Enns
        Attorneys for Defendants Axus
        Stationery (Shanghai) Ltd., Shanghai
        Marco Stationery Co. Ltd., Shanghai
        Laikesheng Pen Material Co. Ltd.,
        Andre Viegas, Peifeng Xu, Roberta
        Trading Corporation, and Kenpark Ltd.
        and Counterclaimant Roberta Trading
        Corporation

# EXHIBIT A

RANDOLPH GAW (S.B. #223718)
  rgaw@gawpoe.com
MARK POE (S.B. #223714)
  mpoe@gawpoe.com
SAMUEL SONG (S.B. #245007)
  ssong@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiff and Counterclaim Defendant
Products and Ventures International and
Counterclaim Defendant Carlos Fairbanks

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| PRODUCTS AND VENTURES INTERNATIONAL, <br><br> Plaintiff, <br><br> v. <br><br> AXUS STATIONERY (SHANGHAI) LTD., et al., <br><br> Defendants. | Case No. 4:16-CV-00669-YGR <br><br> **PVI AND CARLOS FAIRBANKS'S NOTICE OF MOTION AND MOTION TO ENTER JUDGMENT PURSUANT TO SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEREOF** <br><br> Judge: Hon. Yvonne Gonzalez Rogers <br> Hearing Date: July 17, 2018 <br> Time: 2:00 p.m. <br> Courtroom: 1, Fourth Floor |
| ROBERTA TRADING CORPORATION, <br><br> Counterclaimant, <br><br> v. <br><br> PRODUCTS AND VENTURES INTERNATIONAL and CARLOS FAIRBANKS, <br><br> Counterclaim Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 1

ARGUMENT ............................................................................................................. 8

I.    THE COURT SHOULD ENTER JUDGMENT UPON THE PARTIES'
      SETTLEMENT. ............................................................................................. 8

II.   DEFENDANTS MAY NOT AVOID JUDGMENT BY REFUSING TO SIGN A
      WRITTEN SETTLEMENT AGREEMENT ................................................ 11

CONCLUSION ....................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American Title Ins. Co. v. Lacelaw Corp.*,
   861 F.2d 224 (9th Cir. 1988)................................................................12

*Bowers v. Raymond J. Lucia Companies, Inc.*,
   206 Cal. App. 4th 724 (2012) ...............................................................9

*Doi v. Halekulani Corp.*,
   276 F.3d 1131 (9th Cir. 2002)...............................................................9

*Elyaoudayan v. Hoffman*,
   104 Cal. App. 4th 1421 (2003) ............................................................11

*Facebook, Inc. v. Pac. Nw. Software, Inc.*,
   640 F.3d 1034 (9th Cir. 2011)..............................................................10

*Mason v. MediFit Corp. Servs., Inc.*,
   No. 17-CV-02542-JST, 2018 WL 1609374 (N.D. Cal. Apr. 3, 2018).....................10

*McMillion v. Rash Curtis & Assocs.*,
   No. 4:16-CV-3396 YGR, 2017 WL 6033736 (N.D. Cal. Apr. 18, 2017)..................8

*Osumi v. Sutton*,
   151 Cal. App. 4th 1355 (2007) ..............................................................9

*Spellbound Dev. Grp. Inc. v. Pac. Handy Cutter Inc.*,
   No. SACV090951DOCANX, 2012 WL 12905301 (C.D. Cal. July 3, 2012) ............11

**Statutes**

Cal. Civ. Code § 1657 .......................................................................11

Cal. Code Civ. Proc. § 664.6........................................................... *passim*

**NOTICE OF MOTION AND MOTION**

**TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT on Tuesday, July 17, 2018, at 2:00 p.m., in the courtroom of the Honorable Yvonne Gonzalez Rogers, located in Courtroom 1, 4th Floor, at 1301 Clay Street, Oakland, California 94612, Plaintiff and Counterclaim Defendant Products and Ventures International ("PVI") and Counterclaim Defendant Carlos Fairbanks (collectively, the "Moving Parties") will and hereby do move the Court for an order entering judgment against defendants Axus Stationery (Shanghai) Ltd. ("Axus"), Shanghai Marco Stationery Co. Ltd. ("Shanghai Marco"), Shanghai Laikesheng Pen Material Co. Ltd. ("Shanghai Lexon"), Peifeng Xu, Andre Viegas, Kenpark Ltd. ("Kenpark"), and defendant and counterclaimant Roberta Trading Corporation ("Roberta Trading") (collectively, "Defendants") pursuant to the Parties' oral settlement placed on the record during their January 25, 2018 settlement conference.

This motion is made pursuant to California Code of Civil Procedure section 664.6 on the grounds that the parties agreed to an oral settlement on the record during a court proceeding, that Defendants have refused to comply with their obligations under that settlement, and that the parties had stipulated that the Court would retain jurisdiction to enforce the terms of their settlement.

This motion is based on this notice of motion, the attached memorandum of points and authorities, the concurrently filed Declaration of Randolph Gaw ("Gaw Declaration"), the concurrently filed Declaration of Andy Liao, all papers and pleadings on file with the Court, and such other written or oral argument and materials as may be presented before the Court takes this motion under submission.

**STATEMENT OF RELIEF SOUGHT**

The Moving Parties seek an order entering judgment against Defendants and in favor of the Moving Parties pursuant to the parties' oral settlement made on the record during the January 25, 2018 settlement conference: (1) that Defendants will pay $4.4 million to PVI, (2) that all claims and counterclaims in this litigation are dismissed with prejudice and released by the parties, (3) that there is a mutual waiver of costs, (4) that the parties shall otherwise bear their

own attorney's fees and costs, and (5) that the Court shall retain jurisdiction to enforce the terms of the settlement agreement.

## STATEMENT OF ISSUES TO BE DECIDED

1.     Whether the Court should enter judgment in favor of the Moving Parties and against Defendants based upon the parties' oral settlement made on the record during the January 25, 2018 settlement conference pursuant to California Code of Civil Procedure section 664.6.

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

On January 25, 2018, all of the parties in this action attended a settlement conference with their attorneys before Magistrate Judge Laurel Beeler. At that conference, the parties and their counsel agreed on the record to settle this action by: (1) having Defendants pay $4.4 million to PVI, (2) having all claims and counterclaims in this litigation dismissed with prejudice and released by the parties, (3) having a mutual waiver of costs, (4) having each party bear their own attorney's fees and other expenses, and (5) having the Court retain jurisdiction to enforce the terms of the settlement agreement. The parties freely accepted these terms, acknowledged that they understood those terms, and agreed that the terms were binding and final.

Now, months later, it has become clear that Defendants rue the deal they made, and are attempting to rewrite the agreement with terms that were never discussed, much less agreed to by PVI. Specifically, Defendants refuse to sign a final written settlement agreement between the parties unless: (i) the two legally defunct, non-existent defendants Shanghai Marco and Shanghai Lexon are named as the only responsible payors under the agreement, leaving PVI with no recourse in case of default; (ii) PVI waits *over a year* until July 1, 2019, to receive *any payment*; (iii) PVI waits nearly *six years* until April 24, 2024, to be paid in full; and (iv) PVI accepts half of the total settlement ($2.2 million) in Chinese currency ("RMB") paid to a Chinese bank account instead of in American dollars ("USD"). Accordingly, the Moving Parties have no choice but to bring this motion pursuant to California Code of Civil Procedure section 664.6 to have the Court enter a final judgment to enforce the binding oral settlement that the parties agreed to in January.

## STATEMENT OF FACTS

### *The Parties' Settlement Agreement*

Following two years of hard-fought litigation, on January 25, 2018, Mr. Fairbanks, on behalf of himself and PVI, and his counsel Mr. Gaw attended a settlement conference before Magistrate Judge Beeler. (Declaration of Randolph Gaw In Support of PVI and Carlos Fairbank's Motion to Enter Judgment Pursuant to Settlement ("Gaw Decl.") ¶ 2 & Ex. A at 3:14-21.) Mr. Fairbanks had full settlement authority for the case. (*Id.*) Also in attendance were Mr.

Viegas, on behalf of himself and the other Defendants, and his counsel Ms. Enns, Ms. Welch, and

Mr. Wong. (Gaw Decl. ¶ 2 & Ex. A at 3:23 – 4:4.) Mr. Viegas had full settlement authority for

the case. (*Id.*) On the record, the parties orally agreed to the following settlement:

> **THE COURT**: Okay. All right. I am going to recite the terms of the settlement. I am going to ask the lawyers if I've missed anything, and then I'm going to ask the parties if they understand and accept the terms of the settlement.
>
> The total settlement amount is $4.4 million.
>
> The defendants are going to retain, through their counsel, Winston and Strawn, will retain an expert regarding the mechanics of payment by Chinese companies into a U.S. Bank.
>
> If there is an impediment that is insurmountable, the parties will deal with it then.
>
> I will continue to assist the parties with the mechanics of settlement.
>
> The contemplation is that by February 15, Winston and Strawn will have -- will report back to me and to plaintiff's counsel about the mechanics, with the understanding that sometimes, because of the timeline of retaining somebody and people's schedules, it might take more time. So everyone understands this is -- that counsel working together in good faith will meet that deadline, but will accommodate reasonable requests for an extension.
>
> Ultimately all of this will be -- this payment will be in return for dismissal of the entire case, including the counterclaims with prejudice.
>
> There will be a written settlement agreement which will contain a release of all claims in the litigation. There will be a mutual waiver of costs.
>
> The parties will otherwise bear their own fees and costs because there will be likely process for the mechanics of payment.
>
> The Court will -- the parties have agreed that the Court will retain jurisdiction to enforce the terms of the settlement agreement, and I think that probably the contemplation is that the parties will consent to my retaining jurisdiction to enforce the terms of the settlement agreement with -- with the remainder that you have to include that in the stipulated dismissal for it to be effective.
>
> Have I missed anything from the plaintiff's perspective?
>
> **MR. GAW**: No, your Honor.
>
> **THE COURT**: So that's an accurate recitation of the settlement terms?
>
> **MR. GAW**: Yes, your Honor.
>
> **THE COURT**: And from the defendants' perspective?

**MS. ENNS**: Yes, your Honor. That's correct.

**THE COURT**: Okay. Good.

So, Mr. Fairbanks, do you understand the terms of the settlement that I've just recited into the record?

**MR. FAIRBANKS**: Yes, I do.

**THE COURT**: Do you understand that if you accept the terms, it ends the case and you can't reopen it?

**MR. FAIRBANKS**: Yes, I do.

**THE COURT**: Do you accept the terms of the settlement?

**MR. FAIRBANKS**: Yes, I do.

**THE COURT**: All right. And so Mr. Viegas, as defendant and counterclaimant, do you understand the terms of the settlement that I've just recited into the record?

**MR. VIEGAS**: Yes, I do, your Honor.

**THE COURT**: Okay. Do you understand that if you accept the terms, it ends the case and you can't reopen it?

**MR. VIEGAS**: Yes, I do, your Honor.

**THE COURT**: Do you accept the terms of the settlement?

**MR. VIEGAS**: Yes, I do, your Honor.

**THE COURT**: Okay. So with that we have a binding and enforceable settlement agreement with the material terms in the record.

(Gaw Decl., Ex. A at 4:5 – 6:18; *see also* Gaw Decl. ¶¶ 4-7.)

### *The Moving Parties Attempt to Resolve the Foreign Exchange Control Issues.*

For about two weeks after the settlement conference, the Moving Parties waited for

Defendants to provide an update regarding the issue of remitting currency out of China. (Gaw

Decl. ¶¶ 8-9.)[1] On February 12, 2018, the parties had a call, and Defendants provided an update

---

[1] To avoid overwhelming the Court with numerous exhibits, the Gaw Declaration recounts the material contents of e-mails exchanged between counsel for the parties in lieu of attaching those e-mails. Should Defendants challenge the contents of the Gaw Declaration, or if the Court wishes to see those e-mails for itself, the Moving Parties will supply those e-mails for the Court's review. In addition, all references in this Statement of Facts to any communications sent by any of the parties should be understood to mean communications sent by their counsel, acting as the agents for those parties.

as to several possible ways for having money transferred outside of China:

1. Having payments made through individuals (with a limit of $50,000 over a certain period of time).

2. Reducing the parties' settlement to a judgment, and then having that judgment registered with the Chinese authorities. This was because a simple settlement agreement would not likely be recognized by the Chinese banks and the banks would not transfer currency outside the country as a result.

3. An arbitration award, as Chinese courts have enforced international arbitration awards in the past pursuant to the New York Convention.

(*Id.* ¶ 10.) During this same call, Defendants asked whether the Moving Parties would agree to have Axus engage an independent auditing firm to review its financial records to give reassurances to its bank(s) that the company was financially sound before any payments were made by it to a bank account outside of China. (*Id.*)

Also during this February 12 call, the Moving Parties raised the possibility of Axus simply acquiring PVI as part of the settlement, as a means of obtaining permission from the Chinese authorities to send currency outside of that country, which Defendants agreed to investigate. (*Id.*) Defendants also agreed to investigate the possibility of having Defendants' payments come from a Vietnam corporation that was a wholly owned subsidiary of Axus, which operated its main processing plant for Axus Stationery. (*Id.*)

Following this call, the Moving Parties quickly agreed to Defendants' request to engage an independent auditor. (*Id.* ¶ 11.) The parties then sent a joint update to Judge Beeler on their progress in finalizing a written settlement agreement. (*Id.* ¶ 12.)

Over the next three weeks, the Moving Parties periodically asked for updates from Defendants, but received no response. (*Id.* ¶¶ 12-14.) The Moving Parties also indicated that it would agree to the following options:

1. Having Axus assign its receivables to PVI so that those customers could pay PVI directly in USD.

2. Having Axus pay a portion of the settlement in RMB to PVI, in order for PVI to obtain payment sooner rather than have to wait to deal with China's foreign exchange controls.

3.     Having Axus acquire PVI.

4.     Having the parties obtain a private arbitration award with that
       award being enforced against Axus in China.

(*Id.* ¶¶ 14-15.)  Defendants eventually responded by stating they would not make payments

through Axus's Vietnam subsidiary, but would be open to paying PVI in RMB.  (*Id.* ¶ 15.)  For

the first time, Defendants also broached the subject of a "timeline for completion of settlement

payments" to PVI, which was odd because ███████████████████████████████████████

██████████████████████████████.  (*Id.*)

      On March 14, 2018, the Moving Parties informed Defendants that based on their research,

it appeared that the two most feasible options for remitting currency outside of China to complete

the settlement payment was either to have a private arbitration award, or to have Axus assign its

receivables to PVI (something that it repeatedly did with Kenpark, as shown by numerous records

produced in this case).  (*Id.* ¶ 16.)  The Moving Parties also indicated that if Defendants agreed to

assign Axus's receivables, PVI would be willing to work out a short-term payment plan and

would be willing to accept up to $500,000 of the settlement in RMB, provided that the latter

payment was made "very soon."  (*Id.* ¶¶ 16-17.)

      Defendants, however, responded a few days later by rejecting the option of assigning

Axus's receivables, claiming that the Chinese government monitors those receivables to ensure

that sales of outgoing goods are matched by incoming funds.  (*Id.* ¶¶ 18-19.)  Defendants rejected

this option even after the Moving Parties pointed to evidence in the record that Kenpark does not,

in fact, remit all of its assigned receivables back to Axus.  (*Id.* ¶¶ 20-23 & Exs. B, C at 9-13, &

D.)  Indeed, Kenpark's own verified interrogatory responses show that Axus had sent

$19,963,720 **back to Kenpark** after Kenpark had supposedly remitted to Axus "all the money

that was paid to Kenpark by Axus customers[.]"  (*Id.* ¶¶ 18-19, 22 & Ex. C at 9-13.)  Defendants

also rejected the idea of an arbitration award between the parties and asked that PVI accept the

full amount of the $4.4 million settlement in RMB, to which the Moving Parties replied that PVI

would take only up to $500,000.  (*Id.* ¶ 18.)  The Moving Parties also re-raised the idea of having

Axus acquire PVI.  (*Id.*)

The parties sent another joint update to Judge Beeler on March 19, 2018. (*Id.* ¶ 19.) On March 21, 2018, the Moving Parties again raised with Defendants the issue of Axus acquiring PVI. (*Id.* ¶ 24.) PVI's Chinese attorneys had found an Outbound Direct Investment ("ODI") agent who strongly believed that he could help Axus and PVI pass the required governmental examination process. (*Id.*) PVI's attorneys were very optimistic about the success of this approach and that it was the most feasible way for Axus to remit the full $4.4 million settlement payment to PVI outside of China. (*Id.*; Declaration of Andy Liao In Support of PVI and Carlos Fairbank's Motion to Enter Judgment Pursuant to Settlement ("Liao Decl") ¶ 2.) PVI's proposed ODI agent was also willing to condition around 80% of his total fee upon Axus Stationery and PVI passing the governmental examination. (Liao Decl. ¶ 5; Gaw Decl. ¶ 24.) As part of the process, however, Axus would have to provide its financial records to that ODI agent. (Liao Decl. ¶ 5; Gaw Decl. ¶ 24.)

Defendants responded a few days later by asking for the contact agent of the proposed ODI agent, which the Moving Parties readily provided. (*Id.* ¶¶ 26-27.) Defendants also asked for – and received – the Moving Parties' consent to their choice of an independent auditor. (*Id.* ¶¶ 25-26.) Defendants also again asked for PVI to consider a payment plan and was again rebuffed by PVI unless Defendants agreed to have Axus acquire PVI. (*Id.* ¶ 26.)

The parties then spent the next two weeks arranging the logistics for a meeting between themselves and the ODI agent, and also sent another update to Judge Beeler during the interim. (*Id.* ¶¶ 28-29.) On April 18, 2018, local counsel for the parties met in person in Shanghai to discuss amongst themselves the mechanics of Axus acquiring PVI and the parties obtaining ODI approval for the transaction. (*Id.* ¶ 30.) PVI's local counsel, however, developed the sense during this meeting that Defendants' counsel was not sincerely interested in pursuing this option. (Liao Decl. ¶¶ 3-4.)

On April 25, 2018, local counsel for the parties again met in person in Shanghai along with the ODI agent. (Gaw Decl. ¶ 31; Liao Decl. ¶ 5.) During that meeting, the ODI agent explained the requirements for the ODI process and expressed his optimism about obtaining governmental approval for Axus's acquisition of PVI. (Liao Decl. ¶ 5.) The ODI agent also

explained he needed various financial records from Axus in order to do a preliminary review of the assignment (which he would not accept if following his review, he did not think it was likely the government would approve the transaction) and quoted an industry standard fee that was almost entirely contingent on securing governmental approval. (*Id.*) For some unknown reason, however, Defendants' local counsel again expressed reservations about this potential deal. (*Id.*)

Over the next three weeks, the Moving Parties contacted Defendants to inquire about the parties' next steps, only for Defendants to ignore those communications or reply with non-substantive information. (*Id.* ¶ 7; Gaw Decl. ¶¶ 32-36.) On May 18, 2018, Defendants notified the Moving Parties that they did not want to proceed with having Axus acquire PVI. (Gaw Decl. ¶ 36.)

### *Defendants Attempt to Re-Write the Parties' Settlement Agreement.*

On March 24, 2018, Defendants sent a proposed written settlement agreement to the Moving Parties. (*Id.* ¶ 37 & Ex. E.) Among other things, Defendants proposed that:

1. The only Defendants obligated to pay PVI were Shanghai Marco and Shanghai Lexon.

2. PVI would receive quarterly payments of $220,000 with the balance not being fully paid off until April 1, **2024**.

3. PVI would not receive its first payment until July 1, **2019**.

4. Half of the total $4.4 million settlement (or $2.2 million) would be paid to PVI in RMB to a bank account located in China.

(*Id.* ¶ 38 & Ex. E § 1.)

The Moving Parties were outraged by Defendants' proposal. (*Id.* ¶ 38.) Contrary to what the parties agreed to back on January 25, 2018, Defendants were attempting to create a judgment-proof settlement by limiting liability under the settlement to two non-existent, legally defunct entities in Shanghai Marco and Shanghai Lexon. (*Id.* ¶ 38.) Defendants also sought to avoid making any payments at all for a full year, and to take six years to pay off their settlement. (*Id.*) Defendants were also trying to pay half of the settlement in RMB. (*Id.*) Defendants' proposal had no discussion whatsoever about what mechanics they would use to remit foreign currency outside of China – the one issue that the parties agreed to continue discussions about following

the settlement conference.  (*Id.* ¶ 39.)  Defendants' proposal also had no mention of the independent auditor that was supposed to review Axus's financial records – the purported reason why Defendants delayed for two months in making any progress on finalizing a written settlement agreement.  (*Id.*)

The parties submitted another joint update to Judge Beeler on May 28, 2018.  (*Id.* ¶ 40.)  On May 30, 2018, the Moving Parties submitted a redline of Defendants' proposed settlement agreement.  (*Id.* ¶ 40 & Ex. F.)  The redline gave Defendants approximately seven months from the January 25, 2018 settlement conference to complete their $4.4 million payment to PVI, allowed Defendants to remit up to $500,000 of that settlement figure in RMB, and gave extra time to Defendants to complete their obligations if they optionally elected to pursue an acquisition of PVI by Axus.  (*Id.*)

On May 31, 2018, the parties participated in a settlement conference call with Judge Beeler.  (Gaw Decl. ¶ 42.)  Further communications were exchanged by the parties, but Defendants have not yet accepted the Moving Parties' redline or made a formal counterproposal that addresses the issues raised by the Moving Parties.  (*Id.* ¶¶ 43-44.)

**ARGUMENT**

**I.      THE COURT SHOULD ENTER JUDGMENT UPON THE PARTIES' SETTLEMENT.**

"If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court **or orally before the court**, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement.  If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."  Cal. Civ. Proc. Code § 664.6 (emphasis added).  Section 664.6 is considered substantive California law, and is therefore applicable to the parties' settlement given that this Court is sitting in diversity.  *McMillion v. Rash Curtis & Assocs.*, No. 4:16-CV-3396 YGR, 2017 WL 6033736, at *2 (N.D. Cal. Apr. 18, 2017).  And if California law did not apply for some reason, under federal law an oral settlement agreement made in open court and placed upon the record is similarly binding and may also be summarily

enforced without an evidentiary hearing. *Doi v. Halekulani Corp.*, 276 F.3d 1131, 1137-38 (9th Cir. 2002). As the Ninth Circuit has explained:

> Rather, here, the plaintiff made a binding settlement agreement in open court: when read the terms of the agreement, and asked if she agreed with them, Doi simply responded, "yeah." At a time where the resources of the federal judiciary, and this Circuit especially, are strained to the breaking point, we cannot countenance a plaintiff's agreeing to settle a case in open court, then subsequently disavowing the settlement when it suits her. The courts spend enough time on the merits of litigation; we need not (and therefore ought not) open the flood gates to this kind of needless satellite litigation.

*Id.* at 1141.

Here, both parties assented in open court to Judge Beeler's recitation of all terms of the parties' settlement, including the provision that the Court would retain jurisdiction to enforce the terms of the settlement agreement. And it is undisputed that Defendants have not paid a cent of the $4.4 million they owe to PVI. Thus, "Section 664.6 permits the trial court judge to enter judgment on a settlement agreement without the need for a new lawsuit." *Osumi v. Sutton*, 151 Cal. App. 4th 1355, 1360 (2007). The Court is to determine whether the parties had entered into a binding settlement agreement, and may consider oral testimony or declarations to determine the motion. *Id.*

Like all contracts, determining whether the parties had agreed to the settlement agreement "is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe." *Bowers v. Raymond J. Lucia Companies, Inc.*, 206 Cal. App. 4th 724, 733 (2012). And here, there can be no debate that the parties had agreed to the terms that the Moving Parties now seek to enforce. Both Mr. Viegas and his counsel Ms. Enns (as well as Mr. Fairbanks and his counsel Mr. Gaw) firmly agreed on the record to those terms, that they understood those terms, and that they understood that if they "accept the terms, it ends the case and you can't reopen it." (Gaw Decl., Ex. A at 4:5 – 6:18.) One could not find a more definitive outward manifestation of consent by the parties.

Should Defendants argue that terms of the parties' settlement are missing and therefore preclude its enforcement, then the Ninth Circuit's primer on California contract law and settlement agreements is instructive:

> [A] term may be "material" in one of two ways: It may be a necessary
> term, without which there can be no contract; or, it may be an important
> term that affects the value of the bargain. Obviously, omission of the
> former would render the contract a nullity. But a contract that omits terms
> of the latter type is enforceable under California law, so long as the terms it
> does include are sufficiently definite for a court to determine whether a
> breach has occurred, order specific performance or award damages. This is
> not a very demanding test[.]

*Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1037–38 (9th Cir. 2011) (internal citations omitted).

Here, there is simply no missing term from the parties' oral settlement that would qualify as "necessary." The parties agreed to the amount to be paid by Defendants to PVI. The parties agreed that each of them would dismiss all claims and counterclaims with prejudice. The parties agreed to bear their own fees and costs. The parties agreed that the Court would retain jurisdiction. And as Judge Tigar pointed out earlier this year in granting a section 664.6 motion, if any missing "terms were 'crucial and material to [the] end bargain,' [Defendants]–who [were] advised by counsel throughout these proceedings–would have placed those terms on the record." *Mason v. MediFit Corp. Servs., Inc.*, No. 17-CV-02542-JST, 2018 WL 1609374, at *3 (N.D. Cal. Apr. 3, 2018). Neither Ms. Enns nor Mr. Viegas asked on the record to incorporate any additional terms, thereby indicating there were no "necessary" terms that were missing. Moreover, the fundamental point is that Defendants could have chosen not to agree to any settlement at all, but instead they did so agree and further agreed that the settlement was "binding and enforceable" and that all "material terms [are] in the record." *Id.* (*See also* Gaw Decl., Ex. A at 6:16-18.) It is now too late for buyer's remorse.[2]

---

[2] The only other term on the record was that Defendants would retain an expert to investigate the mechanics of paying the $4.4 million settlement payment into a U.S. Bank. (Gaw Decl., Ex. A at 4:9-24.) Defendants did that, and then summarily rejected all of those options. *Infra* at 12-14. In any event, the settlement itself was not conditioned on the parties agreeing to a particular method of transferring currency out of China, only that the parties would explore the options for doing so. This is because **it is PVI that bears the risk** of having nothing more than a paper judgment in the event that it is forced to attempt collection on that judgment on Defendants' various assets located around the world. By this motion, PVI freely accepts that risk.

## II.  DEFENDANTS MAY NOT AVOID JUDGMENT BY REFUSING TO SIGN A WRITTEN SETTLEMENT AGREEMENT.

Defendants may contend that the parties' settlement is not enforceable because it was never reduced to writing and signed by the parties. This argument should be rejected. As the California Court of Appeal has held:

> Often, in cases where an oral settlement is placed on the record in the trial court, a written agreement will follow. If difficulties or unresolvable conflicts arise in drafting the written agreement, the oral settlement remains binding and enforceable under section 664.6. Having orally agreed to settlement terms before the court, parties may not escape their obligations by refusing to sign a written agreement that conforms to the oral terms.

*Elyaoudayan v. Hoffman*, 104 Cal. App. 4th 1421, 1431 (2003). *See also Spellbound Dev. Grp. Inc. v. Pac. Handy Cutter Inc.*, No. SACV090951DOCANX, 2012 WL 12905301, at *2 (C.D. Cal. July 3, 2012) ("Thus, as in *Elyaoudayan*, the parties' consent on the record is ample proof that a settlement contract had been formed…. Thus, to the extent that Defendants argue that Plaintiff's recalcitrance in formalizing the settlement agreement is a basis for holding that no agreement was created, Defendants' argument fails as a matter of law.").

The Moving Parties presented Defendants with a draft written agreement that formalized the material terms of the parties' settlement, but Defendants have refused to sign that document. (Gaw Decl., Ex. F.)[3] As *Elyaoudayan* provides, Defendants cannot avoid enforcement of the parties' settlement by such actions. Moreover, Defendants' conduct throughout the post-settlement period strongly indicates that they had no serious intention of settling on the same terms they had agreed to during the January 25, 2018 settlement conference. For example:

**First**, even though there was not even a hint of a payment plan mentioned during the January 25, 2018 settlement conference, Defendants' draft settlement agreement proposed that PVI would not be paid in full until six years later, with the initial payment not even beginning

---

[3] Indeed, the Moving Parties' draft written agreement gave an extremely generous time for Defendants to complete their obligation to pay PVI – a minimum of 60 days from execution of the contract, or approximately 7 months after the January 25, 2018 settlement conference. (Gaw Decl., Ex. F § 1.b.) This proposed deadline is in line with California law on contract interpretation. *See* Cal. Civ. Code § 1657 ("If no time is specified for the performance of an act required to be performed, a reasonable time is allowed.").

until July 1, **2019**.  (Gaw Decl., Ex. E § 1.)  Insultingly, Defendants also proposed to pay half of the settlement amount ($2.2 million) in RMB.  (*Id.* § 1.c.2.)

Moreover, PVI had expressly offered to accept $500,000 of the total settlement payment in RMB, to avoid any further delays in payment caused by China's foreign currency controls.  (Gaw Decl. ¶¶ 14-16, 18.)  Defendants have ignored this offer, which only demonstrates that the current impasse is due to their utter unwillingness to pay in general, and not primarily because of any complications caused by China's foreign currency controls.

**Second**, Defendants' draft settlement agreement proposed that only Shanghai Marco and Shanghai Lexon had the obligation to pay PVI.  (Gaw Decl., Ex. E § 1.)  Defendants, of course, have judicially admitted that both of these entities have ceased operations and, in the case of Shanghai Marco, does not even officially exist anymore.  (Second Amended Complaint (ECF No. 206) ¶¶ 3-4; Answer to Second Amended Complaint (ECF No. 208) ¶¶ 3-4.)  *See American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("A statement in a complaint, answer or pretrial order is a judicial admission, as is a failure in an answer to deny an allegation.").  In other words, Defendants want to turn an oral settlement that is jointly and severally binding upon each of them into an absolutely toothless settlement agreement, as PVI would literally have no legal recourse if neither Shanghai Marco nor Shanghai Lexon perform.  Unbelievably, as of the date of this motion, Defendants have refused to budge from this position.

**Third**, Defendants reported to the Moving Parties that under Chinese law, individuals could transfer a total of $50,000 in currency outside of China approximately every year.  (Gaw Decl. ¶ 10.)  Axus employs numerous people, and it would be an easy enough task to aggregate 88 of them to pay off the $4.4 million owed to PVI, and then have Defendants reimburse those employees.  Defendants have ignored this idea.

Moreover, Defendants refuse to consider the possibility of anyone other than Axus supplying the payment funds in the first place.  Notwithstanding the fact that Mr. Viegas (who is an American citizen, *see* ECF No. 208 ¶ 7) can transfer his non-RMB cash holdings without restriction, Defendants steadfastly refuse to have him pay anything.  Mr. Xu can also pay his fair share, but he chooses not to.  Furthermore, Roberta Trading (a Washington corporation, *see* ECF

No. 208 ¶ 2) and Kenpark (a British Virgin Island corporation headquartered in Hong Kong, *see* ECF No. 206 ¶ 5 & ECF No. 208 ¶ 5) are not subject to Chinese currency restrictions, but Defendants consider them to be off-limits as well.

**Fourth**, Defendants reported to the Moving Parties that one possibility of collecting funds from them was to have the parties' settlement reduced to a judgment, and then have that judgment registered with the Chinese authorities. (Gaw Decl. ¶ 10.) Defendants apparently refuse to consider that possibility, but by this motion, the Moving Parties seek to have that choice made for them.

**Fifth**, Defendants reported to the Moving Parties that another possibility of collecting funds from them was to have an international arbitration award between the parties. (*Id.* ¶¶ 10, 14, 16.) Defendants apparently refuse to consider that possibility as well. (*Id.* ¶ 19.)

**Sixth**, the Moving Parties discovered that one way to remit large sums of money outside of China would be through an acquisition of PVI by Axus that gets approved by the ODI process. (*Id.* ¶¶ 10, 12-14, 18, 24, 26-31.) The third-party ODI agent expressed optimism about the chances of success for this procedure, but Defendants refused to pursue this course as well. (*Id.*) Given Defendants' conduct during the discussions over this option (*see* Liao Decl. ¶¶ 3-6), the Moving Parties suspect that the real reason they declined to pursue this approach was either out of a reluctance to share their financial records with a third-party connected to the Chinese government or because this approach would, in fact, be successful and Axus would end up having to remit the $4.4 million settlement payment to PVI.

**Seventh**, the Moving Parties suggested that Defendants pay the settlement through Axus's wholly-owned subsidiary in Vietnam. (*Id.* ¶¶ 10, 13.) Defendants would not pursue this approach either. (*Id.* ¶ 15.)

**Eighth**, the Moving Parties suggested an extremely plausible option for getting PVI paid in U.S. currency – having Axus assign its non-Chinese receivables to PVI much like how it currently assigns those receivables to Kenpark. (*Id.* ¶¶ 14, 16.) Defendants rejected that idea and claimed that it was impossible, because the Chinese government supposedly monitors receivables to make sure that sales of outgoing goods are matched by incoming funds. (*Id.* ¶ 18.) Defendants

further asserted that in the case of Kenpark, "all the money that was paid to Kenpark by Axus customers was remitted to Axus" for those aforementioned reasons. (*Id.* ¶ 19.)

Apart from the dubious nature of the claim that the Chinese government literally inspects the receivables of every single corporation that does business outside the country, the Moving Parties pointed out that that Kenpark's general ledgers undermined Defendants' claims that it had fully remitted all funds received from Axus's customers to Axus. (*Id.* ¶¶ 20-23.) For example, these records reflected that Kenpark had kept $3 million in assigned receivables for itself in 2009-2010 rather than remit them to Axus. (*Id.* ¶ 21 & Ex. B.) In addition, these records show that Kenpark had classified its transfers to Axus as "investments" rather than as remittances of assigned receivables. (*Id.*)

Defendants' conflicting statements made in the course of this litigation further show that their representation here was false. In Kenpark's interrogatory responses verified by Mr. Viegas under penalty of perjury, Kenpark states that it sent $19,315,614.11 to Axus between 2008 to 2012 (as "investments"). (Gaw Decl. ¶ 22 & Ex. C at 9-13.) And Kenpark's 2015 year-end balance sheet reflects that this exact amount exists on its books as an "investment" in Axus, thereby showing that Kenpark treated these remittances as being used to acquire an asset as opposed to simply transferring to Axus what it had collected from Axus's customers as a convenience. (Gaw Decl. ¶ 23 & Ex. D.) Even more interestingly, Kenpark's interrogatory responses also reveal that in 2011, Axus **remitted $19,963,720 back to Kenpark**. (Gaw Decl. ¶ 22 & Ex. C at 12.) If Defendants are right that the Chinese government monitors receivables, it is hard to believe that the Chinese government somehow failed to notice that nearly $20 million of Axus's proceeds from its receivables were transmitted back from the company to Kenpark.

Furthermore, during the deposition of Kenpark's Rule 30(b)(6) corporate designee, that witness had no idea if payments made either by PVI or by Axus's customers to Kenpark were subsequently remitted in full to Axus. (ECF No. 107-3 at 82:4-12, 94:2 – 97:18.) Perhaps for that reason, Defendants subsequently characterized those transfers from Kenpark to Axus as "loans" rather than as remittances of receivables in a filing to this Court. (*See* Amended Complaint (ECF No. 100) ¶ 92; Defendants' Motion to Dismiss Amended Complaint (ECF No.

106) at 17:2-8 (specifically addressing paragraph 92 of the Amended Complaint along with other paragraphs).)  That Kenpark did not actually transmit all of Axus's assigned receivables back to Axus is likely why Kenpark's corporate designee also admitted that, in general, Kenpark freely transferred money to other Axus-affiliated companies as "intercompany loans" purportedly because it was easier that way compared to having money directly sent out of Axus.  (ECF No. 107-3 at 103:6 – 104:18.)  In any event, this evidence only demonstrates that with respect to the assignment of receivables approach, Defendants were simply making up excuses as to why it could not pay PVI under this approach.

**Ninth**, Defendants expressly asked to hold off on making any payments to a U.S. bank until Axus had first engaged an independent auditing firm to review its financial records.  (Gaw Decl. ¶¶ 10.)  The Moving Parties, of course, repeatedly provided their consent to this approach. (*Id.* ¶¶ 11, 25-26.)  But after Defendants selected their preferred auditor, they have not mentioned him again.

Perhaps one could explain away one or two of the examples described above.  Having nine different examples, however, leads to only one logical inference.  Defendants simply changed their mind and no longer wanted to be bound by the terms they had agreed to.

## CONCLUSION

For the aforementioned reasons, the Court should issue an order entering judgment against Defendants Axus Stationery (Shanghai) Ltd., Shanghai Marco Stationery Co. Ltd., Shanghai Laikesheng Pen Material Co. Ltd., Peifeng Xu, Andre Viegas, Roberta Trading Corporation, and Kenpark Ltd., and in favor of Plaintiff and Counterclaim Defendant Products and Ventures International and Counterclaim Defendant Carlos Fairbanks, pursuant to the parties' oral settlement made on the record during the January 25, 2018 settlement conference: (1) that Defendants will pay $4.4 million to PVI, (2) that all claims and counterclaims in this litigation are dismissed with prejudice and released by the parties, (3) that there is a mutual waiver of costs, (4) that the parties shall otherwise bear their own attorney's fees and costs, and (5) that the Court shall retain jurisdiction to enforce the terms of the settlement agreement.

Dated:  June 12, 2018

GAW | POE LLP

By: _____
    Randolph Gaw
    Attorneys for Plaintiff and
    Counterclaim Defendant
    Products and Ventures International and
    Counterclaim Defendant Carlos
    Fairbanks